The People of the State of New York, Respondent, v Joseph Karpowski, Appellant.

First Department, February 14, 1984

**APPEARANCES OF COUNSEL**

*Ronald D. Degen* of counsel (*O'Rourke & Degen,* attorneys), for appellant.

*Vija Kemanis* of counsel (*Mark Dwyer* with her on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

**OPINION OF THE COURT**

Asch, J.

Appellant was convicted of grand larceny in the second degree for allegedly stealing money and jewelry belonging to one Carla Cavalli while driving her and a companion from Kennedy Airport to Manhattan. The facts adduced at trial were as follows:

The complainant, Mrs. Carla Cavalli, an Italian citizen, testified through an Italian interpreter. She resides in Italy, France and occasionally New York. Late in June of 1981, while in Paris, she prepared for a one-month visit to New York City. A maid who had been in Mrs. Cavalli's employ for two or three years helped her to pack. Another maid who worked in the Paris apartment had left for the weekend. On the evening of June 29, 1981, Mrs. Cavalli personally packed the handbags she planned to carry on

the airplane. One bag (the leopard bag) was approximately 20 inches long, 12 inches wide and closed with a zipper on the top. At the bottom of this bag, Mrs. Cavalli placed two envelopes containing money tied together with a rubber band. One was a large white envelope containing 1,100 pounds sterling and the other, a smaller brown envelope holding 50 or 60 American dollars as well as some Barbados currency. Barbados currency is multicolored, red, blue and green.

In the leopard bag, Mrs. Cavalli also packed 22 or 23 pieces of jewelry which she had acquired over the course of a number of years. The jewelry was contained in a red and a blue sack, both of which zippered shut at the top. In the red sack were five small boxes containing jewelry, with latching mechanisms that opened by pressing a button. Inside each box was a holder to which the respective pieces of jewelry were affixed. Also within the red sack were many rings contained in a black bag which was closed with a leather strap. Inside the blue sack were several strands of pearls and some bracelets.

This jewelry was made of genuine gold, emerald, diamond, ruby, pearl, sapphire, topaz and jade. Mrs. Cavalli testified that she paid the equivalent of $2,500 for a ruby ring, $1,500 for two of the gold bracelets and $300 for one of the gold rings. Also in the leopard bag Mrs. Cavalli packed several personal items, including a makeup bag and a lapsed insurance policy covering her jewelry which she testified was to prove to Customs officials that the jewelry belonged to her. After packing the leopard bag in her bedroom the evening before the trip, Mrs. Cavalli went to sleep. She awoke about nine or 9:30 A.M. on June 30. That day she stayed at home and received no visitors in her apartment prior to departing. Mrs. Cavalli traveled to New York with Teho Rossi di Montelera, who was also an Italian citizen, with residences in Paris and New York. Although they had been living together for about 23 years, they maintained separate apartments in Paris. Mr. Montelera and Mrs. Cavalli left from her Paris apartment at about 3:00 P.M. on June 30. Altogether they had four large suitcases and four carry-on articles. On the way to the airport and before boarding the plane Mrs. Cavalli held onto the leopard bag.

Mrs. Cavalli and Mr. Montelera took the Concorde flight departing from Paris at 5:00 P.M. and arrived in New York at 2:00 P.M. While on the plane the leopard bag was kept underneath Mr. Montelera's seat. Mrs. Cavalli remained in her seat for the duration of the flight but her companion got up to use the restroom shortly prior to landing. At that time, Mrs. Cavalli pulled the leopard bag from under his seat and opened it to get her lipstick and mirror in the makeup bag. The leopard bag, which had not been entirely full when she had first packed it, by then also contained newspapers and magazines that they had put into it during the flight. In the process of getting the makeup bag she moved the other articles in the handbag and noticed that the blue sack felt heavy. When Mr. Montelera returned to his seat, he saw Mrs. Cavalli looking through the leopard bag and saw the red and blue sacks inside.

Upon arrival in New York, Mrs. Cavalli carried the leopard bag off the plane and through Customs. They went through Customs quickly without a search of their hand luggage. A skycap then loaded their four large suitcases on a dolly and went with them toward the taxi stand outside of the International Arrivals Building.

Police Officer James McCarthy, a policeman for the Port Authority, testified that the taxi stand in front of the International Arrivals Building is located on an island across the street from the building. The dispatcher at the taxi stand generally asks passengers what their destination is and then directs them either to a long-haul or a short-haul cab. Long-haul cabs go to Manhattan and the other boroughs. Short-haul cabs go only to points close to the airport, such as Forest Hills. The dispatcher has yellow fliers, preprinted in two or three languages, that have the numbers of the Taxi and Limousine Commission and the police desk at Kennedy Airport. The dispatcher writes the medallion number of the cab on the flier and gives the flier to the passengers of the cab, telling them to hold on to it in case they have any trouble.

When Mrs. Cavalli and Mr. Montelera arrived at the taxi stand, the defendant, who was one of the 50 regular short-haul drivers, had parked his cab across the street, out of the line with the rest of the cabs. The defendant was

middle-aged, of medium height, with gray hair and nicely dressed with a windbreaker and a necktie. He waved to the skycap who had Mrs. Cavalli's and Mr. Montelera's luggage, crossed the street, took one of the suitcases off the dolly and carried it back to his taxi. He then drove the cab across the street and parked in front of his prospective passengers. The skycap, who had been about to put the luggage into another cab on line, instead steered the dolly containing the luggage toward the defendant's cab. The defendant had difficulty closing the trunk of the cab so Mr. Montelera went to the rear of the cab to help him. Only three suitcases could fit in the trunk, the fourth suitcase and the hand luggage went into the front of the taxi. While Mr. Montelera was paying the skycap, the defendant asked Mrs. Cavalli in a "very genteel manner" if she wished to place her leopard bag in the front. When she refused at first, the driver repeated the question again very politely and stated she would be more comfortable. Mrs. Cavalli testified that she was distracted because it was much warmer in New York than it had been in Paris and she was uncomfortable in her wool clothing, carrying the heavy leopard handbag. She gave the bag to defendant noticing that Mr. Montelera had given his attache case to the driver.

Prior to their leaving the airport the dispatcher handed Mr. Montelera the yellow flier with the medallion number of defendant's cab. Defendant's taxi was a Ford sedan and not a Checker. It had what Mr. Montelera described as an "opaque" plastic partition above the front seat that divided the front from the back and that was almost completely covered with stickers and signs. However, Mr. Montelera sat on the passenger side which did not have all these slips.

After driving only a few minutes, still in the airport complex, the defendant applied the brakes very abruptly to avoid a collision. The abrupt stop had caused the passengers to be thrown forward and thereafter they sat farther back in their seats and could not see the leopard bag in the driver's area after this incident. Later, the defendant asked Mr. Montelera for the yellow flier, which he placed behind the sun visor.

The drive to Manhattan was very slow and took at least an hour even though there was little traffic. The cab veered from side to side, and the passengers thought there was something wrong with the car. At Triborough Bridge, Mr. Montelera testified that he noticed that the cab driver started to pay the toll with a red note. He wondered whether a new currency had been issued in the United States. When they reached the FDR Drive, the defendant asked Mr. Montelera a second time for the address of his destination. They arrived at Mr. Montelera's apartment at 1040 Fifth Avenue at about 4:00 or 4:30 P.M. The doorman and the driver unloaded the luggage and the defendant handed Mrs. Cavalli her leopard bag in a very polite manner.

At Mr. Montelera's New York apartment a maid named Olive was waiting for her employer and Mrs. Cavalli. Olive had worked for Mr. Montelera for three years and was still in his employ at the time of trial. Mrs. Cavalli carried her leopard bag into a bedroom and then took a cold shower. Olive at the time was busy in the kitchen and at the same time was unpacking one of the suitcases in another room. At about 5:00 P.M., Mrs. Cavalli thought she might go out. She looked into her leopard handbag for the envelope with the American dollars. Because she remembered placing the envelopes in the bottom of the bag, she removed all of the contents from the top. She then discovered that the envelopes were gone. Mrs. Cavalli decided to wait until 2:00 A.M. New York time (8:00 A.M. Paris time) to call her maid in Paris to see if she might have left the money in her safe there. When Mrs. Cavalli called Paris, her maid checked the safe and reported that it was empty. After the call to Paris, Mrs. Cavalli became more concerned. Mr. Montelera, apparently seeking to reassure her, told her she should be thankful that she had not lost her jewels. Mrs. Cavalli opened the red sack and found that one of the jewelry boxes inside was empty. She then opened the rest of the jewelry boxes in the black and blue sacks and found her jewels gone. She notified the police of the loss later that day.

On March 2, 1982, the jury convicted defendant of grand larceny in the second degree. Thereafter, the defendant

moved to set aside the verdict on the ground that the evidence was insufficient to support the conviction. After memoranda had been filed, the court rendered an oral decision on October 6, 1982 denying defendant's motion to set aside the verdict. The court stated, in part, as follows: "This case really — I think falls on a line, really. I think it can go either way; and I'm sure a very reasonable person that prepares is even — that's more reasonable than me, could take it the other way. I don't think both people would be wrong * * * I hope I was reasonable in this area and I believe that the jury was proper in finding there was proof beyond a reasonable doubt. Very tenuous, I admit. A lot of questions here from the fact that perhaps others may have intervened, may have been involved through the difficulty in taking the jewelry out of the box in the cab, the fact that perhaps somebody else was at the Fifth Avenue apartment * * * Again, just to reiterate, there are holes. There were holes in the People's case. From 'A' priority, it's a weak case because its circumstantial; and a circumstantial case is, from its very essence, a weak case. There were holes in that weak case".

The trial court was correct in its concern when it denied defendant's motion and in its characterization of the proof as "tenuous" and a "weak case". It is axiomatic that since defendant was convicted at trial, the evidence must be viewed in a light most favorable to the People (see *People v Montanez,* 41 NY2d 53, 57). However, even when viewed in a light most favorable to the People, as the facts have been presented herein, the evidence, which is entirely circumstantial, falls far short of the requisite proof beyond a reasonable doubt.

In cases based upon circumstantial evidence, the Court of Appeals has noted: "We have often had occasion to discuss the proper standard for testing the sufficiency of a conviction based solely on circumstantial evidence, and have clearly stated that the conclusion of guilt must be consistent with and flow naturally from the proven facts, and that those facts viewed as a whole must exclude 'to a moral certainty' every conclusion other than guilt" (*People v Kennedy,* 47 NY2d 196, 202). *People v Kennedy (supra,* p 202) warns that: "Careful review of such cases is needed to

decrease 'a danger legitimately associated with circumstantial evidence — that the trier of facts may leap logical gaps in the proof offered and draw unwarranted conclusions based on probabilities of low degree' (*People v Benzinger,* 36 NY2d 29, 32)."

In the case at bar, the circumstantial evidence pointing to defendant's guilt, when carefully examined, reveals itself to be composed of inferences outweighed by hypotheses which are equally consistent with innocence as with guilt. The following evidence was relied upon by the prosecution as cumulatively establishing guilt: defendant cut in on the line to pick up Cavalli and Montelera, who might have given the appearance of being wealthy; defendant Karpowski could not close the trunk of his car because he was nervous about his planned criminal acts; Karpowski took Mrs. Cavalli's bag and placed it in the front of the cab; defendant Karpowski slammed on his brakes to bring the bag closer to him and to force his passengers to sit back; the partition was covered with papers to block the passengers' view of the front of the cab; defendant drove slowly and weaved from side to side because he was going through the bags; defendant asked for the yellow ticket given out by the dispatcher to avoid being traced; defendant asked for the address of Mr. Montelera the second time because he was so excited he had forgotten it; and also, that defendant had a red currency note in his hand when he paid the toll because he was going through the envelope with the Barbados currency in it at that time.

However, when all the facts are considered as a whole, as we must consider them, they do not exclude "to a moral certainty, every conclusion other than guilt". The fact that defendant cut in line to pick up Mrs. Cavalli and Mr. Montelera, that he had difficulty in loading the luggage into the trunk, that he asked Mrs. Cavalli if she wanted to place her bag in the front seat so that she would be more comfortable, that the partition was covered with stickers, that the taxi weaved from side to side and that defendant asked for the destination a second time, once they were in Manhattan, are unremarkable events which are common occurrences during any taxi ride in New York. In addition, both Mrs. Cavalli and Mr. Montelera testified that the

defendant slammed his brakes to avoid hitting another car. Also, it is not surprising to find a cab driver seeking wealthy passengers, who might be good tippers.

No testimony was adduced to suggest that defendant's actions were unusual or improper. Both Mr. Montelera and Mrs. Cavalli observed and spoke with defendant and yet neither one of them commented that he appeared upset or anxious either at the time he closed the trunk of the cab or any other time. On the contrary, they described him as well dressed and genteel in manner. The fact that defendant asked Mrs. Cavalli if he could place her bag in the front of the cab twice so that she would be more comfortable is also susceptible of a natural and proper inference. This is all the more so in view of Mrs. Cavalli's response in turning over the bag. Mr. Montelera testified that he had given defendant his attaché case without being asked for it and had placed it in the front of taxis on previous occasions. Although Mrs. Cavalli claimed that Mr. Montelera never gave his attaché case to anyone before, thus prompting her to give up her bag when he did so, the attaché case had been placed in the front of the cab in Paris for the ride to the airport from Mrs. Cavalli's apartment. The pieces of paper on the partition of the taxicab are common to cabs in New York City and no evidence was presented that the partition was exceptionally dirty or covered in an unusual way. Furthermore, the pieces of paper were concentrated on the left side of the partition, whereas Mr. Montelera sat on the passenger's side where the luggage had been placed. Mr. Montelera could still see a Vuitton bag, the driver place the yellow piece of paper in the sun visor, and the driver's hands when he paid the toll. The testimony that the taxi drove slowly and went slightly from side to side, from which the prosecution asked the jury to find that the defendant was going through the leopard bag and driving with his knees, must also be deemed to be mere conjecture.

Neither passenger found defendant's actions so unusual so as to warrant comment. Mr. Montelera attributed the cab's movement to a defect in the vehicle. In fact, Mr. Montelera stated that the pulling was "in a very continuous movement." He thought that the slowness of the ride was because something was wrong with the car. Mrs.

Cavalli, in turn, also noted the movement, which she concluded resulted from the wheels being improperly aligned, which is common to cars in Europe. Again, the testimony was that no one "beeped" at Mr. Karpowski or yelled at him for proceeding too slowly. The yellow ticket given to Mr. Montelera contained the taxicab's medallion number. Because the defendant asked for it, the prosecution argued that it should infer he was trying to avoid detection. However, it could equally be inferred that a cab driver would not attempt to steal from passengers whom he picked up at a place where he was well known and was seen by the skycap and dispatcher. In any event, that a cab driver should not want his passengers to file a complaint, such as for driving a faulty, swerving cab in need of repair, is not unusual. The fact that defendant had to ask his passengers for their address a second time, which the prosecutrix maintained was "because he has been so busy stealing their things, and he was not worried about where he was going" is unremarkable for anyone taking a cab in New York City, especially from the airport. Finally, the People argue that defendant inadvertently started to pay the bridge toll with a red note, evidently from Mrs. Cavalli's Barbados currency. It is difficult to believe that a cab driver in New York City would attempt to pay for anything with red money. In addition, Mrs. Cavalli testified that she *possibly* had some Barbados dollars in the envelope. She also continued by stating that Barbados currency is multi-colored, red, blue, brown, green. No evidence, however, was presented that Mrs. Cavalli was *actually* in possession of red currency from any country.

These facts, along with the evidence presented regarding how the jewelry was packed by Mrs. Cavalli, make the conclusion reached by the jury here unfounded, as a matter of law. It is incredible that a person driving an automobile could have taken the property from the bag while remaining unnoticed by his two passengers in the rear of the car. In order to get into the bag, defendant had to unzipper it. Mrs. Cavalli testified that it was filled to the top, with magazines and other materials from the Concorde flight. The money was at the very bottom of the bag, and the jewelry was in various jewelry boxes inside the two sacks,

each of which also had zippers. The jewelry boxes inside the sacks had locking mechanisms and could only be opened by pushing a button to release the latches. The jewelry was held by a holder or little tabs inside the boxes to keep it from moving around. In addition to opening *and closing* all the bags and boxes, defendant Karpowski would have had to remove and secrete two envelopes with money and at least 22 or 23 pieces of jewelry, while driving the taxicab and also while avoiding observation from the passengers. Finally, several questions were raised at the trial concerning the fact that other people had an opportunity to steal the jewels and money, i.e., the maids both in Paris and New York or even Mr. Montelera himself.

In the case at bar, the gap between possible opportunity to commit a crime, and proof beyond a reasonable doubt, cannot be bridged without heavy reliance upon speculation and conjecture. In determining whether the People have met their burden of proof through their use of circumstantial evidence in this matter, "[i]n the end, it is a question whether common human experience would lead a reasonable man, putting his mind to it, to reject or accept the inferences asserted for the established facts" (*People v Wachowicz,* 22 NY2d 369, 372). In the case at bar, a reasonable person led by common human experience would not accept the inferences asserted by the People from the facts which have been presented above in great detail. Cases depending upon circumstantial evidence tend to rely upon more complex reasoning processes and thus are more prone to error. "Hence, close judicial supervision is necessary to ensure that the jury does not make inferences which are based not on the evidence presented, but rather on unsupported assumptions drawn from evidence equivocal at best" (*People v Kennedy, supra,* at p 202).

Accordingly, the judgment of the Supreme Court, New York County (HORNBLASS, J.), rendered December 22, 1982, convicting defendant after a jury trial, of grand larceny in the second degree and sentencing him to five years' probation and fining him $5,000, should be reversed, on the law, and the indictment dismissed.

SULLIVAN, J. P., BLOOM, FEIN and MILONAS, JJ., concur.

Judgment, Supreme Court, New York County, rendered on December 22, 1982, unanimously reversed, on the law, and the indictment dismissed. The matter is remitted to the trial court for the purpose of entering an order in favor of the accused pursuant to CPL 160.50, not less than 30 days after service of this court's order upon the respondent, with leave during this 30-day period to respondent to move and seek any further stay of the implementation of CPL 160.50 as in the interest of justice is required.